No. 13,139.

52 503
112 588

MAUDE V. PETITPAIN VS. MUTUAL RESERVE FUND LIFE ASSOCIATION.

SYLLABUS.

A warranty stipulated in a contract of life insurance, must be strictly complied with, or literally fulfilled, before the insured is entitled to recover on the policy. A warranty need not be material to the risk, because it is of itself an implied agreement that the representations warranted, are material.

APPEAL from the Civil District Court, Parish of Orleans. *St. Paul, J.*

*Parkerson & Tobin* for Plaintiff, Appellant.

*Denegre, Blair & Denegre* for Defendant, Appellee.

The opinion of the court was delivered by

WATKINS, J. This suit is brought by the beneficiary of a policy of insurance upon the life of Frank H. Petitpain, for the sum of five thousand dollars—the plaintiff having been his wife, and now his surviving widow to whom the policy is made payable upon the death of her husband.

The petition alleges, that the policy was issued on the 30th day of March, 1897, by the defendant, and that same was in force at the time the assured died on the 16th day of December, 1897, and that she is entitled to recover the amount thereof—proof of death having been made and furnished to the company as required by the terms of the policy.

For answer, the defendant pleads a general denial, and further answering, sets up the following defenses, to-wit:

1st. Because, the assured committed suicide, and death by suicide is not a risk assumed by the policy within three years from its date.

2nd. Because, in his application, the assured stated that he was, at the date thereof and had been, in good health during the past twelve months; and that he was at the date of said application, and had always been, in good health and free from all ailments, diseases, weaknesses and infirmities; whereas the truth and fact were to the con-

trary—said assured having had, amongst other ailments, diseases, infirmities, and attacks of fits.

3rd. Because, in his said application the assured stated, that he had never had any illness, local disease, or injury, mental or nervous disease or infirmity, or any disease, weakness, or ailment whatever; whereas the truth and fact were to the contrary—said assured besides being subject to fits, had, some years prior to his application for membership as aforesaid, been shot in the back and suffered injury and sickness therefrom.

4th. Because, in his said application, the assured stated that he had never been an inmate of any infirmary, sanitarium or hospital, whereas the truth and fact were to the contrary—said assured having been an inmate of the Charity Hospital of this city, and had been treated therein.

5th. Because, in his said application the assured stated that he had not consulted, or been attended by any physician within nine years, whereas the truth and fact are to the contrary—said assured having frequently consulted physicians during that time.

For the foregoing reasons, the defendant avers that it is not liable to the plaintiff in any sum whatever.

On the issues thus formulated, the case went to trial, testimony was adduced and considered by the judge below, and he thereupon rendered a judgment in favor of the defendant—rejecting the demands of the plaintiff.

It is from that judgment that the plaintiff prosecutes this appeal.

The defendant claims that the application of the assured forms a part of the policy of insurance—same being read into the contract—and that the policy declares, that the latter is predicated upon the application, and that the application for membership in the defendant association, and the policy of insurance that was issued to the assured, warranted "that all of the answers and statements contained therein, by whomsoever written, were full, complete and true; and that it further agreed that the constitution and by-laws of the association, with the amendments thereto, as modified by the board of directors, were made a part of the policy, and that if any of the answers or statements made, were not full, complete and true; or if any condition or agreement should not be fulfilled, as required in said application or in the policy, then the policy issued thereon should be null and void, and all money paid thereon forfeited to the association."

Petitpain vs. Mutual Reserve Fund Life Association.

The policy was issued and bears date March 30, 1897, and the assured died about the 16th day of December, following—his body having been found in the Mississippi river; but there is no proof furnished by the record as to whether his death was the result of accident or intention.

The proof does show, that there were some bruises, of not a very serious character, found upon the body, but insufficient to have reasonably indicated the cause of his death.

The policy acknowledges the receipt of $99.24, as the first annual premium paid thereon, upon the delivery thereof to the assured; and, eveidently, no further premium was paid, as the stipulation of the policy is, for an annual premium of $71.10 on the 6th day of March of each succeeding year during the continuance of the policy.

The policy contains the stipulation, that if it "shall have been in continuous force for three years from its date, it shall, thereafter, be incontestable, except for non-payment of premiums as herein provided for, etc."

It further provides that "death of a member caused by engaging in any violation of law, or by his own hand, whether sane or insane, voluntary or involuntary, is not a risk assumed by this contract, within three years from this date."

These are the two provisions of the policy upon which the defendant mainly relies.

In Part I of the application for membership and policy of insurance, we find the following provision:

"It is hereby agreed that the answers and statements contained in Parts I and II of this application, by whomsoever written, are warranted to be full, complete and true, and that this agreement and the constitution and by-laws of the association, with the amendments thereto, as modified by the board of directors, in adopting other plans and systems as authorized by said constitution and by-laws, together with this application, are hereby made parts of any policy that may be issued thereon.

"That if any of the answers, or statements made, are not full, complete and true, or if any condition or agreement shall not be fulfilled as required herein, or by such policy, then the policy issued hereon shall be null and void, and all money paid thereon shall be forfeited to said association."

In Part II of the application, we find the following:

"I do hereby agree and warrant that the foregoing answers written to the above questions, are my answers, and are full, complete, correct and true, and that the same shall be made a part of my application for membership and policy of insurance."

This application was signed by the applicant, in the presence of the medical examiner.

The following extracts are made from Part II of the aforesaid application, to-wit:

Q—"(2) Are you now, and have you always been, in good health and free from all ailments, diseases, weakness and infirmity?

"A. Yes; except yellow fever eight or nine years ago. Had no physician."

*   *   *   *   *   *

Q.—"(12) Have you ever had any illness, local disease, injury, mental or nervous disease or infirmity, syphilis or any disease, weakness, or ailment of the head, throat, lungs, heart, stomach, liver, kidneys, bladder, or any disease or infirmity whatever? If yes, state nature, date, duration and severity of attack, and whether fully recovered?

A.—"No; except as above.

*   *   *   *   *   *

Q.—"(15)

"A. How long since you consulted or were attended by a physician, give date?    A. 9 years ago.

"B. State name and address of such physician?    B. No physician.

"C. For what disease or ailment?    C. None.

"D. Give name and address of such physician who has prescribed for or attended you within the past 5 years, and for what diseases or ailments, and date?    D. . . . . . . . . . . .

"E. Have you had any illness, disease or medical attendance not stated above?    E. . . . . . . . . . . .

*   *   *   *   *   *

Petitpain vs. Mutual Reserve Fund Life Association.

Q.—"(17)  Have you been an inmate of any infirmary, sanitarium, institute, asylum, or hospital; if so, where, when, duration, for what cause.  State expressly each and every case?

A.—"No."

From the parol evidence adduced on the trial, we gather the following facts pertinent to the issue before the court:

One physician attended a patient bearing the name of Petitpain at his office, and at the Charity Hospital; and that physician states that Dr. Miles attended him previously.  That was in the year 1894.

A witness states that he was a collector for Dr. Miles just prior to his death, and had been so engaged for four or five years previously; that he knew a man by the name of Petitpain who came to Dr. Miles' office, stating that he worked on ships; and that he had seen the same man there frequently, two or three times a week.  He states that he had bills against this man in favor of Dr. Miles to collect.

Another witness states that he knew the assured and was employed on the same ship, and that he knows that he had something like fits; that he knew of his falling down on the deck at sea; saw this more than once.  When in that condition, he was unconscious for awhile, and remained so ten or fifteen minutes.  The witness states, that he knew that the deceased had fits once in the office of the steamer Aransas.  Witness states that he was the purser of the ship.

A certificate was procured from the Charity Hospital bearing date January 25, 1898, and signed by the clerk of that institution, which shows an extract from the admission book, to the effect that Frank Petitpain, clerk by occupation, native of Mexico, age, 21 years, last from Matamoros, was admitted on December 11, 1888, and discharged December 18, 1888. .

A like certificate is produced from the Hotel Dieu, which shows that F. H. Petitpain entered that institution on January 24, 1889, and was discharged January 28, 1889.  That his trouble was a "gun-shot wound; wall of abdomen.  Born in Matamoros, Mexico, age 21 years."

The brother of the deceased as a citizen of New York, was interrogated under commission, and we extract the following from his depositions:

"Third interrogatory:

"Do you know whether or not said Frank H. Petitpain ever suffered from attacks of fits, or had fits; if you say that you do know, please state fully your knowledge on the subject?

"Say whether or not you have personally seen him suffering from any attacks?

"If you say that Frank H. Pititpain suffered from such attacks, say how frequently; and please state whether or not he suffered from any such attacks during the year 1897, etc."

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

The answer is as follows:

"Yes; I know that he had them up to the time I left New Orleans to go to Europe, which was, I think, about 1894. While he was in Mexico, previous to going to New Orleans, he had them only occasionally. This was in the years 1885, 1886, or 1887. He was engaged as purser on one of the Morgan line boats, and on one occasion he went to Saunders' Plantation in St. Mary Parish. He had a difficulty with the son, or nephew of the proprietor of the plantation, about a certain bill of lading. My brother thought the fellow was trying to trick him, and refused to sign the bills of lading, or take the sugar, and as he turned to go, he was shot. He recovered from that, but after that he had fits very frequently. I saw him have as many as eight or ten or fifteen a day, when he was under treatment of Dr. Miles. After Dr. Miles' death he was treated by another doctor; I believe Dr. Bloom. He became better, and did not have them so often. This was between the years 1888 and 1894. At the time I lived in New Orleans, I believe March, 1894, he had gone for three or four months without having any fits.

"Prior to that time, ever since he was wounded in 1888, he had them every year, and very frequently throughout the year. I saw him again and again suffering from these attacks of fits. He was living at my house once, and had them there. For a time he was in the habit of carrying, sewed in the inside of his coat, a piece of linen with instructions written thereon in indelible ink, that should a fit take him in a street car, to look in such a pocket and they would find a vial of some medicine to give him. He was apt to be taken with these fits in any place."

This witness says that his brother was treated for these fits by Dr. Miles and Dr. Bloom, up to the time he left New Orleans; that he was treated in the Charity Hospital, at New Orleans, by Dr. Miles for the gun-shot. That a year later, he was taken to the Hotel Dieu and that the bullet was extracted, one year after he was wounded.

Counsel for plaintiff makes the complaint, that he was a willing witness, and had eveidently given to the company items of his information, so as to enable its counsel to propound the foregoing inter· rogatories. He, also, insists that his statements are extravagant and unreasonable.

On the contrary, the statements of this witness are, in some respects, born out by the statements of other witnesses, and by the certificates from the Charity Hospital and the Hotel Dieu.

The Captain of the steamship Olympia, of the Oteri Line, was interrogated as a witness, and says that he knew Frank H. Petitpain, who was with him as purser on the steamship Rover, in May and June of 1897—that was only a month or two after the policy was issued— that he does not know whether or not he was subject to fits; but that he had an attack of fits once on board of his vessel, and he thinks it was in June, 1897.

He states, that upon his recovery from the attack, he said that he had an attack about four or five years before. The witness says, this was the only occasion he had fits while he was with him on the vessel.

He says that he and the engineer held him for, perhaps, about fifteen minutes; that he held him in his arms and was assisted by the engineer; and if they had not done so, he would have "knocked himself all to pieces; he would have torn himself up."

The foregoing is the substance of the parol testimony; and in our opinion, it is diametrically opposed to several statements contained in the application of the assured.

For instance, he was asked the question if he was then, or had he always been in good health, and free from all ailments, diseases, weaknesses and infirmities; and his answer is, yes; except yellow fever eight or nine years ago; but had no physician. He was, again, asked the question if he had ever had any illness, local diseases, injury, infirmity, disease or ailment, or infirmity of any kind whatsoever; and his answer is, no; except as above. Again, he was asked the question, how long since you consulted or were attended by a physician? His answer is, nine years ago. When asked to state the name and address of such physician, his answer was, no physician.

Again, he was asked if he had ever been an inmate of any infirmary, sanitarium, or hospital, when, for what cause, etc.; and his answer was, no.

In the face of these statements, we have that of the captain of a vessel of which he was purser, that he had a fit on board of a vessel in June, after the issuance of the policy in March; and the statement of a physician, that he had been treated at the Hotel Dieu several years prior to his application.

The proof shows clearly that he had been an inmate of both the Charity Hospital and the Hotel Dieu, on several occasions prior to his application; and that he has been therein treated for a gun-shot wound, and that a bullet had been extracted by a physician attending at the Hotel Dieu, wherein he was a patient.

The extracts made from the application of the assured are to the effect, that the assured warranted the answers and statements therein contained, to be full, complete and true; and, that if any of said answers made were not full, complete and true, then the policy issued thereon shall be null and void.

It further shows, that he agreed and warranted that all the foregoing answers written to the questions therein contained, are full, complete, correct and true, in every respect.

In our view, argument is unnecessary, upon these facts, to demonstrate the violation of the warranty clause of the contracts of insurance.

The statements of the assured in answer to the questions propounded in the application, are absolutely inconsistent and irreconcilable with the parol proof adduced on the trial.

The instant case is quite similar in its facts to that of Weil, Administrator, vs. Insurance Company, 47th Ann., 1405, from which we make the following extract:

"The theory of the defendant's answer is that the application is the primary evidence, on the faith of which *only* the policy was issued to the insured, and that the validity and binding force of the *policy* necessarily depends upon the statements and representations which are made in the *application*.

"Upon this theory the answer avers that the deceased made, in his application, certain statements and representations, and gave answers to certain questions propounded to him in the course of his medical examination, which is made part of the application, concerning facts 'then unknown to the defendant, but *necessary and material to the defendant's risk;*' and it further represents that 'said statements were

false and untrue,' and that the truthfulness of same was 'necessary and material to the defendant's risk.'

"Reiterated, the representations and statements alleged to be untruthful are, that he answered that he had never had any 'severe headaches, vertigo, fits, or any nervous or neuralgic trouble,' whereas he had an attack of trigemical neuralgia in May, 1893, for which he had been treated by a physician for the space of a week; an attack of vertigo or convulsions in October, 1893, for which he was similarly treated for a period of several days; and an attack of *la grippe* in November, 1893, for which he was similarly treated for a period of two weeks.

"That these different attacks of illness, were by the deceased concealed from the medical examiner, and consequently not made known to the defendant at the time it issued the policy.

"And, the further defense is predicated upon the fact, that when interrogated as to the name and residence of his physician, the deceased only gave the name of R. D. Randolph; whereas in truth and in fact, he was attended by Dr. Smith Gordon, as well as by Dr. Randolph, during his attack in May, 1893; and was also examined and prescribed for by Dr. Rudolph Matas, of New Orleans, in May, 1893, at the suggestion of Dr. Randolph, of Alexandria. And in truth and fact, he was attended by Dr. Gordon in September and October, 1893.

"It was not a point made in the answer that the death of the deceased resulted from an *excepted cause* in the risk of the defendant; but this testimony is pertinent to show the *materiality* of the information which was necessary that the defendant should have known in determining whether it would issue a policy, and in enabling the court to estimate the probable effect of the failure of the deceased to make known these facts to the defendant through the instrumentality of his medical examination."

In our view, the points made in this case are quite similar, and are sustained by proof even stronger than the evidence in that case.

Upon a careful examination of the facts, and a large number of authorities bearing upon question involved therein, our conclusions were stated to be as follows:

"Applying the principles of law herein above related to the application of the insured, and to the policy of the insured issued by the company, there is in our minds no possible doubt that there was a breach

of the warranty by the insured, on the faith of which the insurer undertook the risk."

We are of opinion that the judge *a quo* decided the case correctly. Judgment affirmed.