No. 13,720.

MRS. JULIA KLING vs. MASON'S FRATERNAL ACCIDENT ASSOCIATION.

## SYLLABUS.

The burden of proof rests upon the plaintiff to establish, with reasonable certainty, the facts essential to his recovery.

APPEAL from the Twenty-First Judicial District, Parish of Iberville—*Talbot, J.*

*Lozano & Hebert* for Plaintiff, Appellant.

*Calvin K. Schwing* for Defendant, Appellee.

The opinion of the court was delivered by

MONROE, J.　The plaintiff, as beneficiary of an accident policy, for $5000, issued by the defendant company upon the life of Gabriel Kling, her husband, alleges that the assured died from injury resulting from a peril insured against, and prays judgment according to the contract. The answer admits the issuance of the policy, but denies that the death of the assured was caused by violent and accidental injury.

The plaintiff's theory of the case is that the assured, while paring the nail, accidentally cut the little toe upon his left foot; that senile gangrene resulted therefrom, necessitating amputation of the leg; and that death ensued, within the terms of the insurance.　The policy insured the deceased, subject to the by-laws of the company and to the conditions indorsed thereon, against personal injuries effected during its life "through external, violent and accidental means," and obligated the company to pay to the beneficiary $5000 in case death should result from such injury within ninety days.　One of the conditions bars liability in case of death "from disease of any form."

The questions presented for our consideration are:

1.　Has the plaintiff proved that the deceased, in paring the nail, cut his toe?

2.　Should the cutting in such case be considered an accident within the meaning of the policy?

3.　Can it be held to have caused the senile gangrene?

Considering the first of these questions, the evidence relied on as showing that the deceased cut his toe is the testimony of the attending physician and that of the son of the deceased.　The physician, upon his direct examination as a witness for the plaintiff, had apparently indicated that he intended to testify to what his patient had told him as to the origin of the trouble, and the counsel for defendant objected "to " any evidence by the witness as to what Kling had told him as to his " bodily condition or any wound accidentally inflicted upon himself in " trimming or cutting his corns," and the court overruled the objection. And thereupon the witness made the following statement, to-wit: "I " inquired as to the cause of it, and was told by the family that in cut- " ting his toe nails, or corns, a few days previous, he had injured his

"toe. At the time that I saw him, it was not possible to distinguish the "injury on account of the condition of the toe, due to this gangrene." And on cross-examination he says "I do not know of my positive knowl- "edge, that there was any cut on the toe at all. This disease could "have started without any cut at all. * * * In Mr Kling's con- "dition, that disease would not (have been) likely to have broken out "without some accidental cause," etc.

Seymour Kling, the son of the deceased, and of the plaintiff, gives the following testimony on the subject, to-wit: "Blood poison was the "cause of my father's death. The blood poison was caused by his cut- "ting his toe while paring his toe nails. It was in the beginning of "May, 1899, that he cut his toe. Prior to the cutting of his toe, my "father was in perfect good health." Cross-examined: "I know that "the cutting of his toe caused blood poison because the doctor told me "so. I don't know that of my own knowledge. * * * I saw my "father when he cut his toe, it was his little toe on the left foot. I "don't remember whether it was in the morning or evening that my "father cut his toe. I just happened to go up stairs and I saw him sit- "ting down in the hall, smoking his pipe and paring his toe nails. I "did not see him when he cut his toe * * * I saw the toe of my "father very often. I never examined it before it was cut. It must "have been three or four days after my father cut his toe that I heard "him complain. The toe did not bleed profusely when it was cut. I "did not see any blood, but I saw the cut."

There is no other testimony upon the subject. It appears, therefore, that the physician knew nothing of the cutting save what he was told by "the family." But if there were others members of the family, be- sides the son, who knew as much as, or more than, he, it is fair to pre- sume that they would have been put upon the stand. As they were not, we take it for granted that the doctor obtained his information from Seymour Kling, whose testimony we have quoted, so that what that witness says is practically all there is to show that the deceased cut his toe. But Seymour Kling swears in one breath, "I saw my father when he cut his toe, it was the little toe on the left foot", and in the next breath, says, "I did not see him when he cut his toe * * * The toe did not bleed profusely when it was cut. I did not see any blood, but I saw the cut."

The judge a quo found the evidence on this point "unsatisfactory", and we are of the same opinion. When the witness says, first, that he saw the cutting, and, then, that he did not see it, it creates an impres-

sion of thoughtlessness or irresponsibility; but when he again turns about, and, after giving it to be understood as a last word, that he did not see the cutting, tells us "The toe did not bleed profusely when it was cut", and that he did not see any blood, but saw the cut, we are at a loss to know what he means. If he did not see the cutting how does he know that the toe did not bleed when cut? He does not pretend to say that his father told him that he had cut his toe whilst paring his nails; how then does he know what he took to be a bloodless cut was in reality a cut inflicted at the time and under the circumstances testified to by him?

On the other hand, if it be true that a cut upon his father's toe produced no blood, it would indicate a lack of circulation, which could mean nothing but gangrene whether the toe was cut or not. And, if the toe was in that condition, it is not unlikely that his father was aware of the fact, or at least felt that there was something wrong, and the cutting done by him may not have been accidental, but may have been in the way of experimental surgery. This seems not unlikely from the testimony of the physician as to the condition of affairs when he was called in.

With difficulties and doubts such as are thus suggested, as to the testimony of the only witness who pretends to have any personal knowledge of the alleged accident to the toe of the deceased, and in view of the fact that no one, not even the attending physician, has undertaken to say that the deceased himself ever said that he met with such an accident, we find ourselves unable to go any further in the case. It is useless to consider the questions, whether cutting one's toe, whilst paring a nail, is an accident within the meaning of the policy; or whether senile gangrene necessarily results from such cutting, when the fact of the cutting is not established with that reasonable certainty with which the plaintiff is expected to make out his case. The judge *a quo*, though apparently dissatisfied with the proof upon this point, rejected the plaintiff's demand upon other grounds. The judgment is correct and is affirmed.