On Rehearing.
.NICHOLLS, J.
Defendant presses upon us that the conclusion reached by the court of appeal as to whether or not the insured had committed suicide ‘ was not sustained by the testimony in the record, and calls upon us to set it aside.
We have the unquestionable authority, where cases are brought before us through writs of review, to review not only the conclusions of law reached by the court of appeal, but also those of fact, and we would not hesitate doing so where in our judgment the exercise of such authority would be manifestly proper. It is, however, obvious that this court was not intended to be made an appellate court through a mere change in the form of the proceedings by which cases which had been decided below should reach us. The Constitution did not contemplate making it our duty to take up and dispose generally of cases which in character and amount would fall below our regular appellate jurisdiction. A ease should present very exceptional features to induce us to do so.
We do not attempt to lay down any rule on that subject, but will leave each case brought up to be tested by its own special features. State ex rel. Satcho v. Judge, 49 La. Ann. 235, 21 South. 690.
We do not think the situation of this particular case makes it one for exceptional action. The court of appeal evidently gave to the testimony adduced proper attention. The correctness of its conclusion was not acquiesced in as a matter of course by this court on the original hearing. Our opinion shows the testimony was closely scrutinized and considered, but that, while we were much impressed by the view of that testimony submitted to us by opposing counsel, we were not sufficiently so to declare that the conclusions of fact which were reached by the court of appeal were so clearly wrong as to call for a reversal of the judgment. We have on this rehearing examined the testimony again with the same result. The testimony adduced certainly discloses a number of suspicious circumstances tending to establish that the assured committed suicide, but matters 'were left enough in doubt on the subject to have warranted the court below in discarding that theory. The case on the facts, we think, is too close for us to interfere. We take occasion, however, to say that, in determining whether or not a party has committed suicide, courts can act on circumstantial evidence as well as on *579 direct evidence and testimony, and are not tied down in the application of the same by the rigid rules of the criminal law. The law requires, however, that the presumptions upon which they act shall he weighty, precise, and consistent. Civ. Code, art. 2288.
In tlie present case we think the deceased came to his death by opium poisoning, but whether it was taken by himself is not shown, nor is it shown, if taken by himself, whether this was done for the purpose of producing death, or injudiciously, and for the sake of obtaining relief of some kind. There was some evidence introduced (though not very strong in character) on which the latter theory may have been predicated.
If the opium was taken by himself, for the purpose of obtaining relief, while in one sense it could be said that he had “come to his death by his own hand,” it could not be said that he had committed “suicide.”
Kling v. Accident Association, 104 La. 766, 29 South. 332.
The district judge rendered judgment in favor of the defendant on the ground that the answers made by the insured, Armand Rrignac, to the questions asked by the medical examiner of the defendant, were untrue, and that in making such answers he was guilty of a breach of the warranties of the policy. The court of appeal took a different view, being of the opinion that the statements made by Armand Brignac were mere representations, and that the answers given were not material to the risk, and were true from the standpoint of the intended scope of the questions asked.
The policy of insurance itself is on the first of four pages. On the' second page there are printed three headings — the first being “Benefits and Values” (referred to in the foregoing pages of this policy); the second, “Schedule of Policy Values” (this schedule applies to this policy only if free from indebtedness, hut such indebtedness may be paid at any time before policy values are payable); the third, “Schedule of Extended Insurance.”
Under these different headings are subordinate headings or entries. Under the heading “Benefits, Conditions and Values,” for instance, are' the subheadings, “Incontestability,” “Payment of Premiums,” “Dividends,” “Assignment,” “Change of Beneficiary,” “Service in War,” “Error in Age,” “Alterations,” “Loans,” and “Values and Additions.”
On the third page the first heading is: “Application for Insurance to the Pacific Mutual Life Insurance Company of California.” Under this heading, in small type, is printed the following:
“I apply for a contract or policy of life insurance, which, if tendered, I agree to accept, and as consideration therefor offer this application, which includes answers to the Medical Examiner, and which is true and warranted. I agree that any policy which may be granted upon this application shall not be in force until the actual payment to and acceptance of the premium by said Company or its authorized agent while I am in the same condition of health as herein stated. I warrant: That if I die within two years from the date of such policy in consequence of having engaged in any specially hazardous occupation or employment (the specially hazardous occupations or employments herein referred to, are the handling of electric wires or dynamos, blasting, mining, submarine labor, aeronautic ascensions, Arctic explorations, the manufacture, handling and transportation of highly explosive or inflammable substances, service upon any railroad train or in switching and coupling cars, or on any steam or other vessel) without first obtaining written permission of the Company, signed by its President or Vice-President, and Secretary or Assistant Secretary, then such policy shall be null and void; that if I die in consequence of having violated law, or by my own hand, or act voluntary or in *581 voluntary, sane or insane, during such two years the only liability under said policy shall be for the net reserve held thereon computed according to the Combined Experience Table of Mortality, with interest at four per cent per annum; that in any distribution of surplus or apportionment of dividends, the principles and methods which may be adopted by the Company for such distribution or apportionment, and its determination of the amount equitably belonging to any contract which may be issued under this application, shall be and are hereby ratified and accepted by and for every person who shall have or claim any interest under the contract now proposed; that during the first year succeeding the date of any policy which may be issued hereunder, the reserve value shall be computed upon the Combined Experience Table of Mortality with interest at four per cent per annum for the term rate; that prompt notice of the death of the insured shall be given to the Company, and formal proofs on the Company’s blanks be made within one year after death and no suit upon said policy shall be sustainable unless commenced within such year; that such poli-' cy shall lapse and be void if any premium or installment thereon is not paid as therein provided, and that then all previous payments shall be forfeited to the Company except as herein otherwise provided; and, further in consideration of the premises, it is understood and agreed that all right or claim for temporary insurance or any other surrendervalue than that provided in such policy is hereby waived and relinquished, whether required by the statute of any other State or not and such contract shall be held and construed at all times and places to have been made in the City of San Francisco, State of California.”
Below this, to the left, are 10 paragraphs, opposite to which, to the right, are open spaces to be filled up by tne party making the application; for instance:
“1. Name of the person whose life is proposed for insurance.
“2. Occupation. If more than one, state all.
“3_ * * *
“4^ * * *
“5. * * *
❖ * « * * $
“10. Do you understand and agree that only the officers at the home office have authority- to determine whether or not an Insurance contract shall issue on any Application, and that they act only on the statements and representations in the Application, and that no statements, representations or information made or given by or to the person soliciting or taking this Application for Insurance or to any other person, shall be binding on the Company, or in any manner affect its rights, unless such statements, representations, or informatión be reduced to writing and presented to the’ officers of the Company at the Home Office?”
In this application the spaces opposite to these numbers are filled with appropriate entries. Opposite to the number “10” is the entry, “Yes.”
Just beneath the copy of the application with its entries, and connected with it, is a heading, “Questions to be Asked by the Medical Examiner,” and under it to the left are the questions asked, grouped under numbers, while to the right are the answers given.
The following questions appear under the number “13,” with the answers given thereto:
“A. Do you use spirituous, malt or' vinous liquors? If so, what kind? No.
“Spirituous? No. Malt? No. Vinous? No.
“B. State the average quantity you use each day. No.
“C. Have you at any time used them to excess? If so, give full particulars. No.-
“D. Are you now or do you intend to become engaged In or connected with the sale of the same? No.”
*583 The policy itself commences with the words “The Pacific Mutual Life Insurance Co. of California, in consideration of the Application for this Policy which is made a part of this contract (a copy of which is hereto annexed) and of the payment in advance of the sum of * * *, hereby insures the life of Armand Brignac * * *. The benefits, conditions, and values on the next page of this Policy are hereby made a part hereof. * * *”
We think the grounds upon which the court of appeal reached its conclusions had best be stated in the language of the court itself, which was as follows:
“Defendant contends that the answers of the assured in relation to his use of intoxicants were not representations, but were affirmative warranties, a simple violation of which were a breach of warranty, avoiding the policy. We may say at the outset, if these answers of the assured to the medical examiner in relation to the use of intoxicants are considered as affirmative' warranties, their violation, whether material or immaterial to the risk, under the well-established jurisprudence of this state, operate an avoidance of the policy. The question is, áre they representations or warranties? It will be noted that the beginning of the application which refers to the answers made to the medical examiner reads: T apply for a contract or- policy of life insurance,' which, if tendered, I agree to accept, and, as a consideration therefor, offer this application, which includes answers to the medical examiner, and which is true and warranted.’ It is difficult to say to what these words ‘which is true and warranted’ have reference. It would seem that these words ‘which is* refer to the application, and not to the answers made to the medical examiner. Taking, however, these words ‘true and warranted’ as referring to the answers to the medical examiner, it will be observed that there is no penalty or forfeiture attached to them in case of the false assertions of the assured in reference thereto. It is well known that in most every contract of insurance, when a warranty is intended to be stipulated, a forfeiture clause is provided as a penalty for a violation of the warranty. There is a reason for this, as the officers of the company are those who prepare the contract, and it is easy for them to make its provisions clear and explicit. Whether the stipulations are intended to be representations or warranties, the contract should be so drawn as to leave no room for construction or interpretation. In determining the question as to whether or not the answers to the examiner were intended to be affirmative warranties or representations, it will be observed in connection therewith that, as to the promissory warranty which appears in the application as to the future conduct of the assured (should he engage in some hazardous occupation without the express permission of-the company), it is distinctly provided that in such case the policy shall be null and void. Hence there is no doubt by the very words of the application that a promissory warranty was intended to be stipulated,' but it will be noted that the forfeiture clause is distinctly provided. Why this provision of forfeiture for the promissory warranty, and its absence as to the answers to the medical examiner, if these were intended as affirmative warranties? Comparing these two provisions in the application, if the answers to the examiner were intended as affirmative warranties, the forfeiture clause in reference thereto becomes conspicuous by its absence. The use of the forfeiture clause is held by some text-writers to be essential to the avoidance of the policy. May, § 176. Hence the underwriter is to be presumed to know of the importance of this clause, and it is fair to suppose it would have been inserted as a penalty for the violation of answers to the examiner if they had been intended as affirmative warranties. If the wording of the application above quoted and *585 commented upon should, leave a doubt as to •whether -the answers to the examiner were intended as warranties, another part of the application makes clear what the intention of the parties was in reference thereto, and convinces us that these answers were intended as representations, and not as affirmative warranties. Under heading No. 10 of the application, quoted above in full, we find that these answers given to the soliciting agent of the company are characterized as ‘representations.’ The application therefore determines and fixes the character of these answers as representations, and not as affirmative warranties. As before stated, the application is annexed to the policy to be a part of the contract of insurance. The next question is, does the declaration in the policy that the application is made a part thereof make the statements and representations in the application strict warranties, a simple violation of which avoids the policy? The rule of law is that, when the application is declared a part of the policy, they are virtually read into and imported into the contract of insurance. As we understand the law, however, they are imported into the policy such as they are. They are imported therein as representations, and are not by that fact transferred into strict warranties. They retain their feature of representations, and, being annexed to the policy, they form one contract therewith, and they must be construed and interpreted in connection with the language used in the policy to ascertain the meaning of the parties in relation thereto. Defendant, in support of its contention that these answers were intended as warranties, refers us specially to Weil v. Insurance Go., 47 La. Ann. 1405, 17 South. 853. In that case the application contained the following clause, viz.: ‘That the statements and representations contained-in the foregoing application, together with the declarations made by me to the medical examiner, shall be the basis of the contract between me and the New York Life Insurance Company; that I hereby warrant the same to be full, complete, and true, whether written by my own hand or not, this writing being a condition precedent to and consideration for the policy which may be issued thereon.’ The policy in that case also contains a similar provision, viz.: ‘This contract is made in consideration of the written application for this bond policy, and of the agreements, statements, and warranties thereof, which are hereby made a part of this contract,’ etc. By the very language used by the parties therein- it is clear that both in the application and in the. policy the declarations and agreements were specially made warranties and part of the contract of insurance. The application declares that the representations are warranties, and are to be taken as a condition precedent to and in consideration for the issuance of the policy. The policy likewise declares and characterizes these agreements as. warranties. The intention of the parties is therefore clear to the effect that warranties were intended to be stipulated in the ease cited, and no room was therefore left for construction or interpretation.
“Not so here; the application does not stipulate that the answers to the medical examiner are characterized by the application as being representations. Nor does the policy characterize these answers or representations as warranties, as was the ease in 47 La. Ann. 1405, 17 South. 853. The policy in this case merely refers to the application as a part of the contract, without characterizing the application or answers therein contained as warranties, which were declared as such in the case cited.
“In the Moulor Case, 111 U. S. 335, 4 Sup. Ct. 466, 28 L. Ed. 447, upon which the Supreme Court of this state based its opinion in 47 La. Ann. 1405, 17 South. 853, the application stipulated that the representations weré' warranties with a forfeiture clause as a alty, but the policy issued on the application *587 characterized the statements of the insured as ‘representations.’ In construing this contract of insurance the court said in the Moulor Case: ‘Both instruments [referring to the application and policy] therefore may be examined to ascertain whether the contract furnishes a uniform fixed rule of interpretation and what was the intention of the parties. Taken together, it cannot be said that they have been so framed as to leave no room for construction. The mind does not rest firmly in the conviction that the parties stipulated for the literal truth of every statement made by the insured. There is, to say the least, ground for serious doubt as to whether the company intended to require, and the insured intended to promise, an exact literal fulfillment of all the declarations embodied in the application.’
“In this ease the reasoning of the court in the Moulor Case finds special application. The application and policy taken together, it cannot be said that they have been so framed as to leave no room for construction. The mind, as in the case cited, does not rest firmly in the conviction that the parties stipulated for the literal truth of every statement by the insured.”
Proceeding further in the cited case the court said: “The doubt as to the intention of the parties must, according to the settled doctrine of the law of insurance recognized in all the adjudged cases, be resolved against the party whose language it becomes necessary to interpret. The construction must therefore prevail which protects the insured against the obligations arising from strict warranty. This rule is the accepted doctrine in the interpretation of insurance contracts. In this case it is manifest to our minds that it becomes necessary to construe and interpret the contract in order to ascertain the meaning of the parties. The intention of the parties is therefore in doubt; otherwise, no interpretation would be necessary. The doubt, under the familiar rule above cited, must therefore be resolved against the company, whose officers prepared the contract, and whose duty it was to make the contract clear and explicit.” The cases cited by defendant — Hartwell v. Insurance Co., 33 La. Ann. 1353; 39 Am. Dec. 294, and Petitpain v. Association, 52 La. Ann. 504, 27 South. 113-do not militate against the rule announced in 47 La. Ann. 1405, 17 South. 853, which is based on the Moulor Case, above commented upon. We therefore hold that the answers of the insured to the medical examiner as to his use of intoxicants were not intended as affirmative warranties, a- simple violation of which, whether material or immaterial to the risk, operated avoidance of the policy. These answers were representations, and, under the law of pleading (Boisblanc v. Insurance Co., 34 La. Ann. 1167), it is therefore incumbent on the company to support its special defense. The company must therefore prove in the legal sense that the representations were false and material to the risk, or that the deceased committed suicide, or that the policy is avoided if the deceased took his life, whether voluntarily or involuntarily, as stipulated in the promissory warranty.
Plaintiffs’ counsel do not deny on rehearing that the application made by Brignac was annexed to and made part of the policy. They maintain, however, that that fact of itself did not make the answers given by the applicant to the questions propounded to him by the medical examiner warranties, in the sense in which the term “warranty” is used in insurance law. They urge that representations made in an application. for insurance may be imported into the contract of insurance, yet retain their character as such, and be so adjudged from a construction of the two instruments, when taken together. May on Ins. (4th Ed.) § 159, p. 320. They insist that the defendant itself, in its answer in this .case, refers to the questions and answers as being “representations,” as does the company itself in its question No. 10 to the ap *589 plieant, and that the district judge, in affixing to them a different character, went further than did the insurance company itself (May on Insurance, pp. 328, 330, §§ 165, 165a; Houghton v. Manufacturing Ins. Co., 8 Metc. 114, 41 Am. Dec. 489); that the rights of parties must be tested from the standpoint of their being representations, and from that point of view they were substantially true; that the applicant understood, and the company intended him so to understand, that the questions propounded to him were designed to ascertain whether he used liquors “habitually” to “excess,” and not whether he used them occasionally and in moderation, and the answers conveyed to it all the information which the questions called for; that the application was forwarded to the company with certain questions propounded to the medical examiner himself, and in answer to the eighteenth interrogatory, which asked him whether the applicant was as good a risk for insurance as the average of selected lives of the same age, who were of sound constitution and in good health and whose family history was good, and whether, acting for the interest of the company, he advised the acceptance of the risk, he answered, “Yes,” and that the company acted upon this answer, and did not rely upon any strict and absolutely technical and literally correct answers made by the applicant himself to the questions propounded to him.
Plaintiffs say that courts of the present day, in a liberal spirit, seize every indication that the parties meant to exclude forfeiture for immaterial errors, there being no fraud; that honest errors manifestly and undoubtedly immaterial ought to be excluded by the law (May on Ins. § 161, p. 324); that they lean towards construing answers as representations, not as warranties (Id. § 162). They call our attention to the fact that the policy should contain an express declaration that forfeiture of the policy would follow as the consequence of an answer not absolutely correct, and point out that in the policy issued to Brignac such declaration is made as to certain matters contained in the application, but was not made in reference to the answers made to the questions of the medical examiner, and the rule, “Inclusio unius,” finds application.
We think that jurisprudence warrants the plaintiffs in the position which they take, that the mere fact that the application for insurance may be annexed to and made part of the contract does not of itself carry with it necessarily, as a consequence, that all the statements and declarations contained in the former should be held to be warranties, though the failure to so annex the application and make it part of the policy would leave these declarations and statements as representations. However desirable it may be that insurance •companies should be compelled by statute to inform parties applying therefor, on face of the application or of the policy, precisely what facts or circumstances will carry with them a forfeiture of the policy, we are not prepared to say, in the present condition of the jurisprudence on the subject of insurance, that failure so to inform them will have the effect which plaintiffs contend for. We recognize the correctness, however, of the assertion of May, on page 329 of his work, that the courts have apparently begun to see that they have gone far enough under the lead of arbitrary rules in finding constructive warranties on the immaterial, unguarded, and oftentimes superfluous statements contained in the application.
We are of the opinion that, as matters now stand, when the situation is such as will, as a matter of law, carry with it a forfeiture as a penalty, that result will' follow, whether it has been expressly declared or stipulated for or not.
We do not give the same scope and effect to -the question No. 10 propounded to the applicant in the application for insurance, or to the pleadings of the defendant’s answer, *591 as the plaintiffs do. We do not regard them as containing any admission that the “statements and representations in the application” shall be taken and held, in determining the rights of parties, as representations and not warranties.
The tenth question was propounded to the applicant in order to fix, béyond controversy, knowledge and consent on his part that nothing which may have been said or done by the company’s solicitors or agents in connection with the statements, representations, or information given by the applications, should be urged as a defense.
Defendant in its answer averred that the application for insurance made by the deceased, and his answers to the interrogatories therein addressed to him, constituted a portion of the contract of insurance, as was expressly stipulated therein; that certain questions were propounded and were answered by him in said application in relation to his use of spirituous or malt liquors; that deceased, in reply, stated that he did not use spirituous or malt liquors, which statements were untrue, as he did at that time and previous thereto use spirituous liquors, and not seldom to great excess; that the nonuse by the deceased of spirituous or malt or vinous liquors was an important consideration for the contract of insurance, and the false representation of the deceased in relation thereto affords to the defendant legal ground to claim the annulment of the contract of insurance. We do not tie the defendant down by the use of the word “representation” as plaintiffs would have us do. Defendant was evidently using that word in that connection merely as synonymous with the word “statement” or “declaration.”
The court of appeal found ambiguous or uncertain the words contained in Brignac’s 'application, “I apply for a contract or policy of life insurance, which, if tendered, I agree to accept, and, as consideration therefor, offer this application, which includes answers to the Medical Examiner, and which is true and warranted;” but we think that the express declaration made, that the answers to the medical examiner were included in the application, and that the application was true and warranted, made the answers part of the application, and caused them to fall within the warranty of the truth of the application as a whole.
Be this as it may, we do not consider that the determination of the issues raised in this case is dependent upon the conclusion that the answers to the questions were warranties, for we are of the opinion that, viewing them merely as representations, the untruthfulness of the answers should be coupled with the effect which the answers were calculated to have upon the insurance company, as to whether it would enter into the contract of insurance with the deceased.
The declarations just recited show on their face that they were submitted to the insurance company as a presentation of the elements upon which it should decide whether to accept or reject the application, and to estimate the risk proposed to be assumed. The facts, circumstances, and conditions were to be the basis of the contract, its foundation, on the faith of which it was to be entered into. If wrongly presented in any respect material to the risk, the policy that might be issued therefrom should not take effect. To enforce it would be to apply the insurance to a risk that was never presented. The test as to the effect of a misrepresentation is whether it may or may not have influenced the insurer in determining whether to accept the risk, and what premium to charge. We think the application of this test to the case at bar must defeat recovery by the beneficiaries of the policy. In May on Insurance, § 185, we find this rule laid 'down:
“When the representations are in writing, and the parties, by the frame of the contents of the papers, either by putting representa *593 tions as to the history, quality, or relations of the subject insured into the form of specific questions, or by the mode of referring to them in the policy, settle for themselves that they shall be deemed material, they are to be declared so by the court, and the insured cannot be permitted to show that a fact that both parties have treated as material is in fact immaterial. The inquiry shows that the insurer considers the fact material, and an answer by the insured affords a just inference that he assents to the insurer’s view. The inquiry and answer are tantamount to an agreement that the matter inquired about is material.”
“A misrepresentation or concealment by one party of a fact specifically inquired about, though not material, will avoid the policy.” Fame Ins. Co. v. Thomas, 10 Ill. App. 545-556.
“A question and answer are equal to an agreement that the matter inquired about is material, and the question of materiality is not open to the jury.” Cuthbertson v. Ins. Co., 96 N. C. 480, 2 S. E. 258.
The questions asked in this ease were, first, “Do you use spirituous, malt, or vinous liquors?” to which question applicant answered “No.” This answer was not, in point of fact, strictly true, for it is admitted by the plaintiffs that the deceased drank spirituous liquors, though it is declared that he only did so moderately or occasionally, and that the use so made was not detrimental or injurious. This first question was followed by the specific question, “State the average quantity you use each day?” To this question applicant answered “No.” A combination of the two questions; with the answers thereto, amount to a declaration by the applicant that he did not drink at all, for, had he intended to admit that he drank occasionally, he would have given a different answer to the second question from that which he did give; and that fact is emphasized by the answer “No,” given to each of the successive separate questions asked, as to whether he drank spirituous liquors, malt liquors, or vinous liquors.
These questions and answers referred to the situation of things existing at the time of the application, and during a reasonable time preceding that datq. The insurance company did not rest satisfied with existing conditions. It probed the applicant as to the past by asking, “Have you at any time used them [liquors]?” adding “to excess,” and also adding “give full particulars.”
To this question, as to the preceding one, the applicant answered “No.”
If Brignac had given no reply whatever to the question whether he had ever used liquors to excess, and to give full particulars, and the company none the less had issued the policy, it might be assumed that it did not attach any particular importance to the question and to an answer thereto; but he did not leave matters to rest upon that condition of affairs, for he answered “No.”
We have before us, therefore, a case where ■the precise circumstances under which the company would be called upon to elect whether it would enter into a contract with the deceased was affirmatively stated by the latter and untruly stated. The rule, as we understand it, is, whether the misrepresentation or concealment relates to the risk directly, or to incidental matter from which some inference may be drawn as to the propriety of accepting or declining the risk, the result is the same. If a party makes answers or representations touching such incidental matters — as, for instance, relative to his pecuniary means or social or business relations— of such a character that, if they had not been made, the insurer would have declined the risk, then the policy will be void. Nor can it be said here that, had the company known that the applicant had in the past used liquors to excess, or had not been misled as to the necessity of making inquiries as to his antecedents by the answers which were aetu *595 ally given by him, the company would none the less have contracted with him. We cannot with any propriety say that it would, though, from the question asked as to average quantity of liquor he drank daily, we do not think it was the intention of the company to have made their consent dependent upon his showing that he was abstaining totally from drinking.
It evidently reserved the right to determine for itself what it would do from the answers given. It is a well-known fact that a person who has once drunk to excess or gone upon periodical or occasional sprees is not safely to be depended upon as to his future conduct in respect to the same.
The’ following testimony was given by Dr. E. Thompson on this subject:
“Q. Doctor, what do you know of Armand Brignac’s habits previous to his death, before and after the issuance of the policy of insurance, in relation to the use of spirituous, vinous, or malt liquors?
“A. Well, just before— I know very little about it. Some time before, I know he used liquor to great excess. That was some years before the policy was issued. Just about the time he took out the policy, and just after, I cannot say that I knew much about it.
“Q. What was the character of the business he was carrying on at the time he used it to great excess?
‘A. He was keeping a coffee house and drinking establishment.
“Q. At that time wore you not pretty frequently at his place of business, passing by?
‘A. I passed nearly every day.
“Q. Now, state whether you often found him drunk when passing his place of business.
“A. I found bim always under the influence of liquor, and frequently very much so.
“Q. Doctor, were you practicing medicine in his neighborhood?
“A. Yes, sir. I don’t pretend to say I saw him every time I passed. My practice was in that part of the country, and I was practicing on the Bayou Bocalf at that time, and passed in front of his store and saw him frequently.
“Q. You say you saw him frequently under the influence of liquor?.
‘A. Yes, sir.
“Q. You will please state whether you have seen him on the cars during the last fall at any time, and whether he was under the influence of liquor. What was his condition?
‘A. I met him twice during the fall, once last fall, and he was certainly under the influence of liquor at that time, and some time before, it might have been a year. Both times he was coming from New Orleans, and he had been drinking.
“Q. What was the character of the drinking house he was conducting out there — was it a respectable place or a low dive?
‘A. It was a disgrace to the community, and I passed there on Sundays, and saw men drunk lying in the fence corners on the Sundays.
“Q. This place where you saw him frequently under the influence of liquor — was that on a leading public road?
“A. Yes, sir; on the public road.
“Q. Have you not, on more than one occasion, seen him too drunk to attend to business?
‘A. I cannot say that, because I would have to go inside to see that. He kept a saloon eight, nine, or ten years ago.”
That was the time witness referred to in his testimony. Witness did not frequent his establishment. He was outside the establishment once or twice. He could not say he passed there daily, but frequently, sometimes once or twice in a day, and sometimes he did not pass there. He practiced in the country around there. He did not stop to speak to him. He observed he was under the influence of liquor by seeing him *597 ■at tlie door, and showing every evidence of .a man under the influence of liquor. Witness would see him when passing along the highway. He did not stop to converse with him, but he frequently had occasion to stop .and speak to some one at his store — out in front of his store — and sometimes some one witness knew would stop him, and he would see him. The last time witness met him on the train under the influence of liquor was last fall, sometime in October or November. The case was on trial on the 9th day of December, 1902. Witness did not know whether or not, just previous to October 1st, and for two or three years previous thereto, he used spirituous liquors at all. 1-Ie did not know, except on the one or two occasions on the train.
Counsel of plaintiffs ask: “To what does the question, ‘Do you use spirituous, malt, or vinous liquors?’ direct the mind of the person questioned? Is it a mere occasional or isolated use? Everybody knows that life insurance companies do not confine their business to the issuance of policies on the lives of total abstainers. Therefore the average man, when such question is asked, will conclude at once that the company wants to know whether he is a man who uses liquor to such an extent as will increase the risk or hazard of the policy, and the courts have so regarded such questions. They have held that there must be a habitual use of such liquors to establish the falsity of the questions of an assured to the effect that he used no such liquor.” They refer the court to May on Insurance, pp. 379, 637, 638; to Van Valkenburgh v. Am. Popular Life Ins. Co., 70 N. Y. 605; Standard Dictionary, verbo “Habit,” also verbo “Use”; Grand Lodge v. Belcham, 145 Ill. 308, 33 N. E. 886; Meacham v. N. Y. State Mutual Ass’n, 120 N. Y. 237, 24 N. E. 283; Union Mutl. Life Ins. Co. v. Reif, 36 Ohio St. 596, 38 Am. Rep. 613, and note, pages 615 and 616, 38 Am. Rep. We cannot agree with counsel that the natural answer which one in the ordinary station of life would give to the question, “Do you use spirituous liquors?” would be “No.” On the contrary, the natural answer would be, “I drink sometimes,” or “I drink moderately or occasionally,” if such was the fact. We scarcely think it can be claimed, when he is asked “to give the average quantity he used each day,” that the natural answer would be “No,” nor that, when asked whether he had ever used spirituous liquors to excess, he would naturally say “No.” He would reasonably be expected to give a qualified answer of some kind, and not reply simply, “No.” The answers given were misleading answers. We need not inquire what answers one would reasonably have expected made to questions as to whether he was “addicted” to the excessive use of liquors — what his “habits” were in respect to the use of liquors; for no such questions were asked in this case. The fact that the defendant company might have been willing to insure Brignac, had they known the exact situation in this case, is totally irrelevant. It was in fact entitled to have been placed in position to pass .on that question upon answers truthfully made to the questions asked of him.
We think the judgment of the court of appeal brought before us for review is erroneous. For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that said judgment be and the same is hereby annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that plaintiffs’ demand be and the same is hereby rejected, and the suit dismissed, with costs in both courts.
LAND, J., concurs in the decree. PROVOSTY, .1., dissents.